Laible *v.* Ferry.

Johanna Laible and others, appellants,

*v.*

Ebenezer L. Ferry and others, respondents.

| 32 | 791 |
| 57L | 399 |

| 32 | 791 |
| 60 | 473 |

| 32 | 791 |
| 61 | 194 |

1. Executors, empowered by the will of their testator to carry on his business after his decease, are personally liable for the debts contracted thereby.

2. But they have a right, in equity, to indemnify themselves for the payment of such debts, out of the property lawfully embarked in the trade.

3. From such right springs an equitable right of the trade creditors to resort to such fund for payment, if their remedy against the executors be unavailing.

4. *Prima facie,* only the property invested in the business at the testator's decease is regarded as the trade fund; and it requires a clear and unambiguous declaration of purpose in the will to justify the subjection of any other property to the risks of the venture.

5. Under certain circumstances, the fee-simple of land was held to be thus involved.

6. Where executors, carrying on business under a will, had, without authority, used the proceeds of the business to improve lands of the testator not subjected to the risks of trade, and which, under the will, belonged, in remainder, to married women and infants,—*Held,* that this would not justify the court in charging the estate of these remaindermen, to any extent, with the trade debts.

On appeal from a decree of the vice-chancellor, whose opinion is reported in *Ferry* v. *Laible, 4 Stew. Eq. 466.*

*Mr. William H. Morrow,* for appellants, cited—

*Perry on Trusts* § *475; McNeillie* v. *Acton, 4 DeG. M. & G. 744; Burwell* v. *Mandeville, 2 How.* (*U. S.*) *577; Kirkman* v. *Booth, 11 Beav. 280; Travis* v. *Milne, 9 Hare 141; Hampton* v. *Nicholson, 8 C. E. Gr. 423; Russell* v. *Russell, 36 N. Y. 581; Allen* v. *Dewitt, 3 Comst. 276; Roome* v. *Phillips, 27 N. Y. 357; Powers* v. *Bergen, 6 N. Y. 359; Smith* v. *Brown, 35 N. Y. 83; Booraem* v. *Wells, 4 C. E. Gr. 87; Briggs* v. *Davis,*

*20 N. Y. 15; 3 Barb. 361; 56 Barb. 266 and cases; 1 Sandf. Ch. 17; Shaw v. Spencer, 100 Mass. 390; Wilson v. Hill, 2 Beas. 143–151; Haggerty v. McCanna, 10 C. E. Gr. 48; Putnam v. Ritchie, 6 Paige 404; Prall v. Tilt, 1 Stew. Eq. 484; Jaudon v. City Bank, 8 Blatch. 430, 15 Wall. 115; Nichols v. Peak, 1 Beas. 71, 72; Johns v. Norris, 12 C. E. Gr. 487, 488; Prall v. Hamil, 1 Stew. Eq. 69, 70; Hoy v. Bramhall, 4 C. E. Gr. 563–572; Raritan Water Power v. Veghte, 6 C. E. Gr. 478.*

Mr. E. Q. Keasbey, for respondents, cited—

*Ex parte Garland, 10 Ves. 120; Ex parte Richardson, 3 Madd. 138; Thompson v. Andrews, 1 Myl. & K. 116; Cutbush v. Cutbush, 1 Beav. 185; McNeillie v. Acton, 4 DeG. M. & G. 744; Owen v. Delamere, L. R. (15 Eq.) 139; Taylor v. Plumer, 3 Mau. & Sel. 575; Shaler v. Trowbridge, 1 Stew. Eq. 595; Hall v. Pidcock, 1 C. E. Gr. 311; Doughaday v. Crowell, 3 Stock. 201.*

The opinion of the court was delivered by

Dixon, J.

John Laible died in August, 1862, leaving a will dated February 4th, 1862, containing the following provisions, viz.:

"Second.—I give and bequeath unto my beloved wife, Johanna, the use, improvement and income of all my real estate, houses and lots, to have and to hold the same to her for and during her natural life, provided she remains a widow and unmarried.

"Third.—I give and bequeath unto my said wife, Johanna, also, all my personal property, household and furniture and clothing, to have and to hold the same to her, her heirs and assigns forever, except all things belonging to the brewery business.

"Sixth.—I hereby order that the hereinafter appointed executors and my wife Johanna shall have the power to put the interest which shall be received, or the profits, out of the brewery business, out on bond or mortgage, or to purchase real estate, but, in such case, they shall not purchase anything unless they can pay cash for the whole; and they shall also have the power to sell, but in all such transactions the hereinafter named executors and my wife, Johanna, shall all agree in such transactions.

Laible *v.* Ferry.

"Seventh.—I do hereby order that my son John Laible shall be the exclusive manager of my brewery business; but if it should be that the executors and my wife, Johanna, within one year, or sooner or later, that through his, John Laible's neglect, wrong or default, debts been made, contracted, or a loss in the business found, then the said business shall be let out or sold, just as the executors, with the consent of my wife, Johanna, may see fit; the said John Laible shall also keep the books of said business in a lawful manner, and for the best interest of the family.

Eighth.—The manager, John Laible, shall receive yearly for his services five per cent. of the amount of sale made each year, and a free dwelling and fuel; but if the business should increase, then the executors may give him an additional amount for his services as they may see fit.

"Ninth.—I do hereby order that the manager of the business shall receive one per cent. from every dollar worth sold as spend money, which said money shall be paid out of the business itself.

"Tenth.—If the business is so well managed, as I hope it will, and it should have a good progress, then I order that the said business shall be sold to my said sons, John, Philip and William Laible, as soon as the two latter shall have arrive the nineteenth year of age, to a reasonable price.

"Eleventh.—If my beloved wife, Johanna, should die before my aforesaid sons shall have arrived to the age aforesaid, then my son John Laible shall, with the other executors, carry on the business in harmony.

"Twelfth.—If my wife, Johanna, should marry again, then she shall receive five hundred dollars each and every year, but her husband shall have in no way, shape or manner, the right to interfere in the business or real or personal property concern; he shall be so considered as if he was not in existence; and if my wife should get children out of such marriage, those children shall have no claim in any shape or form in my property, real or personal.

"Thirteenth.—If my wife should die as my widow, then the real and personal property then remaining shall go to my grandchildren.

"Fourteenth.—I do hereby order that there shall be no difference between my children now in existence.

"Fifteenth.—I do nominate and appoint my wife, Johanna, Louis Adam and Joseph Seitel, to be the executors of this my last will and testament, and I do hereby also authorize and empower my said wife, Louis Adam and Joseph Seitel, to make purchases or sales in the above-stated cases."

This will was duly proved, September, 1862, by the executors named therein. Up to the time of his death the testa-

tor was engaged in the brewery business, in the city of Newark, carried on upon a tract of land owned by him, which will be hereinafter designated as the brewery lot. Upon it were a brewery building and cellars, and other substantial structures necessary for the purposes of the business. He also owned a lot known as the Gormley lot, adjoining the brewery lot on the south, upon which was his family dwelling; and a lot known as the Wilbur lot, adjoining the brewery on the north, upon which were a shop and dwelling, rented out to tenants. He also owned other houses and lots. After his death, his son John became the manager of the business, carrying it on under the authority of the executors. He resided at some little distance from the brewery, on property not belonging to the testator, and the case does not disclose that any arrangement was made in pursuance of that portion of the eighth clause of the will, which provides for his having a " free dwelling."

For a time the business was prosperous under John's management, and considerable improvements were made with its proceeds on the brewery lot, for the benefit of the trade. In 1867, an expensive dwelling-house, costing over $20,000, derived mainly from the business, was built upon the Wilbur lot, and thereupon the testator's widow, with her family, moved into it from the house on the Gormley lot, and that house was removed to make room for a boiler and other conveniences of the brewery.

The complainants were the principal creditors of the business, having furnished almost all the malt used in it, and at the time of filing their bill, in 1876, were creditors to the amount of $65,000, which had begun to accrue in the latter part of 1868.

John, the son, died in March, 1873; Seitel, one of the executors, is also dead. The complainants filed their bill against the surviving executors, and all persons in csse having any possible interest under the will, and sought a decree that the brewery lot, the Wilbur lot and the Gormley lot,

and all other property of the testator in the hands of the
executors, and the accumulations thereof, were chargeable
with the indebtedness to the complainants, and should be
sold for the payment of the same.

The chancellor, on advice of the vice-chancellor, decreed
that the brewery lot and the Gormley lot, together with all
the buildings, improvements, machinery and fixtures, with
appurtenances, together with all the appurtenances and per-
sonal property of the business, whether owned by the tes-
tator at the time of his death, or purchased with the proceeds
or property of the trade since, should be deemed to be the
trade property proper, and chargeable with the payment of
all debts contracted in the said trade, and should be sold for
that purpose, and that in case this fund was insufficient, the
Wilbur lot should be sold, and out of the proceeds of sale
should be reserved the value of the same, without the
improvements made with the moneys derived from the bus-
iness, and the balance should be applied to paying the trade
debts. From this decree two of the daughters of the testa-
tor, with their husbands, have appealed to this court.

The leading question presented by the appeal is, as to the
rights of creditors of a business carried on under a will. It
is manifest that, in this case, the testator designed that his
brewery business should be continued after his decease, by
his executors, on behalf of his estate, under the manage-
ment of his son John. John was to receive a specified
compensation for his services, but the profits were to go to
the executors, who were also empowered, under certain
circumstances, to put an end to the trade. In such cases
the general rule is, that the executors are personally liable
for the debts contracted. *Owen* v. *Delamere, L. R. (15 Eq.)
134; Wightman* v. *Townroe, 1 Mau. & Sel. 412; Labouchere*
v. *Tupper, 11 Moore P. C. 198.* But for what they do in
obedience to their trust, they are entitled in equity to be
indemnified out of the property lawfully embarked in the
business, and from this title to indemnity springs an equita-
ble right of the creditors to resort to the same fund for pay-

ment, when their remedy against the executors is unavailing. *Ex parte Garland*, *10 Ves. 110*.

In *Owen* v. *Delamere*, *ubi supra*, Vice-Chancellor Bacon dismissed the creditor's bill, upon the ground that the remedy at law against the executors seemed to be ample; and in *Fairland* v. *Percy*, *L. R. (3 P. & D.) 217*, Sir James Hannen required the creditor to exhaust, by administration, the property of his primary debtor, before receiving administration, as an equitable creditor, of the testator's estate.

In the present case no direct averment of the insolvency of the executors, individually, is made in the bill, but the evidence sufficiently discloses their inability to meet the complainants' claim, and no objection has been made, either below or here, to this want of allegation of some special reason for the interference of equity. It may be regarded as conceded that the complainants' remedy at law is inadequate.

The important and difficult question in most controversies of this nature, relates to the amount of the testator's estate which ought to be considered as embarked in the business. The answer is to be found in the correct construction of the will.

In *Ex parte Garland*, *ubi supra*, it was decided that where the will directed a limited sum, beside the property actually employed in the business at the testator's death, to be paid by the executors for the purpose of carrying on his trade, the general assets beyond that fund were not liable. This principle, that the testator may restrict the liability of his estate, either to the fund already embarked, or to such amount as he may intend to have embarked in the business, is also affirmed in *Ex parte Richardson, 3 Madd. 138; Thompson* v. *Andrews, 1 Myl. & K. 116; Pitkin* v. *Pitkin, 7 Conn. 307*, and *Burwell* v. *Mandeville, 2 How. (U. S.) 572*.

In the case last cited, Judge Story, adopting the reasoning of Lord Eldon, in *Ex parte Garland*, *ubi supra*, remarks that nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator

Laible *v.* Ferry.

intends to make his general assets liable for all debts contracted in the trade continued after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion, from the manifest inconvenience thereof, and the utter impossibility of paying off the legacies bequeathed by the testator's will, or distributing the residue of his estate, without in effect saying at the same time that the payments may all be recalled, if the trade should become unsuccessful or ruinous. Such a result would ordinarily be at war with the testator's intention in bequeathing such legacies and residue. These sentiments are quoted with approval by Justice Field, in *Smith* v. *Ayer*, decided in the same court, December, 1879. See *9 Reporter (May 19th, 1880) 633.* *1 o( u·S. 32n s·c.*

In accordance with the views of Judge Story, it was held in *M'Neillie* v. *Acton, 4 De G. M. & G. 744,* that a direction in a will, that executors should continue the testator's trade or business of a coal proprietor during his then present interest in the mines, and should not be responsible for any loss to his estate by carrying on the trade or business, unless such loss should happen by or through their willful neglect or default, did not authorize the employment in the trade of more of the testator's property than was employed in it at his decease. And in *Cutbush* v. *Cutbush, 1 Beav. 184,* where the testator had directed his widow to carry on his business until his youngest child should attain twenty-one years, and for that purpose had given her the entire use, disposal and management of *the capital, credits, stock and effects which should be due, owing or belonging to him in his trade at the time of his decease,* and had authorized his executors to augment the capital employed therein, and, the executors having renounced, the widow had taken out administration, Lord Langdale decided that only the property above specified, and not the testator's general assets, was liable for the debts contracted by the widow in carrying on the trade. So, also, in *Thompson* v. *Andrews, 1 Myl. & K. 116,* the

testator, a brewer and coal merchant, who had carried on his business on a messuage demised to him for a term of years, in his will directed as follows: "It is my wish that my wife and my son Thomas should continue to carry on the business, in the same way that I do now, for their joint benefit and mutual advantage, on the premises in which I now reside; and, in furtherance of this, my wish, I give and bequeath all my stock in trade, of what nature or kind soever by me employed or used, to my said wife and son, in equal shares and proportions." Under certain circumstances, the business was to be discontinued; and, in that event, he gave and bequeathed the lease of the said premises in which he resided, with the appurtenances and all the said stock in trade so given to his wife and son, to trustees, to sell the same, and give one moiety of the proceeds to his said son, and invest the other moiety for the benefit of his wife, and, after death, to go to his two children Edward and Elizabeth. He made his wife and the trustees his executors. The widow and son, carrying on the business, became bankrupts. On bill filed by the assignees, Sir John Leach, M. R., held that the gift over of the moiety of the proceeds of the sale of the leasehold premises to the children, after the death of their mother, would take effect; and, as to that, the claims of creditors were excluded. He said there was no gift of the premises to the wife and son, other than for their occupation so long as they should carry on the testator's trade; and the case of *Ex parte Garland* had decided that a testator's property is liable only to the extent that he has directed it to be embarked in his trade.

The principles deducible from all of these cases, then, are, that where a testator orders his business to be carried on after his death, *prima facie* only the fund employed in the business before his decease is answerable to the subsequent creditors; but that if, by clear and unambiguous language, he designates or authorizes to be set apart any other portion of his estate to be embarked in the trade, such creditors may also resort to the fund thus appropriated.

Applying these principles to the case in hand, we think there is not sufficient reason for subjecting the Gormley lot to the claims of these complainants.

The grounds upon which the vice-chancellor reached the opposite conclusion are, that during the testator's life it was used in connection with the brewery business, because there was a passage-way leading from his dwelling upon it to the brewery premises, and some of his workmen boarded in his family; and that, by his testamentary direction that his son John, while manager of the brewery, should have a free dwelling as part of his compensation, he had indicated a purpose to have this house and lot, as most convenient, occupied as the manager's residence. These circumstances, viewed in the light of the testator's intention to perpetuate his business, seemed to the vice-chancellor a sufficient embarkation of this lot in the business.

But, during the testator's life, these premises were kept quite distinct from the brewery plot, and constituted his residence only. That there was a passage from them to the brewery, and that some workmen boarded with him, were mere incidents of his mode of living, and did not at all make his dwelling-house a part or appurtenance of his business. I think if he had made a conveyance of his brewery, its business and appurtenances, it would have been difficult to conclude that thereby this dwelling and curtilage had also passed to the grantee. Nor is it a fair presumption that the testator intended this to be the " free dwelling " which his son John should occupy while managing the premises. He had other houses, which he was in the habit of letting to tenants, while this was his family homestead, and if he had designed to exclude his wife and minor children therefrom for the convenience of his married son, who was already living away from him, it is reasonable to believe that he would have more explicitly said so. But even if this property were intended to be given up to the son while managing the business, that would not be an embarkation of the fee in the risks of trade. The facts

Laible *v.* Ferry.

would much resemble those in . *Thompson* v. *Andrews, ubi supra,* where, notwithstanding a similar gift of the testator's residence to the managers of the business, the residence was withheld from subsequent creditors, and in *Cutbush* v. *Cutbush, ubi supra,* a like direction in a will does not appear to have been considered as involving the dwelling in the trade. There is wanting that clear and unambiguous declaration of purpose which is necessary in a will to induce courts to postpone legatees and devisees until the posthumous ventures of the testator are ended. This portion of the decree should be reversed.

As to the brewery lot, we concur in the conclusions of the vice-chancellor. Not, indeed, that we think, nor is it evident that the vice-chancellor thought, that in every case where a testator, engaged in a business carried on upon his real estate, directs the business to be continued after his death, he must be held to have involved that real estate in the venture. In each instance, the real purpose of the testator, as indicated by his will and the attendant circumstances, is to be ascertained and enforced. In the present case, the business was of such a nature that it had practically appropriated the land to its uses, rendering it mainly unavailable for other purposes, so that the value of the realty depended substantially upon whether or not this business could be there made profitable. The testator had directed that, if loss were incurred by the management which he provided, *the business should be let out or sold,* as the executor should see fit; but if it were successful, then it should be sold to his sons at a reasonable price. It is hardly conceivable that in these provisions he did not include the realty. The trade and its plant were inseparable, and together constituted, in his mind, *the business.*

Respecting the Wilbur lot, the facts are, that the testator's widow, representing and mainly acting for the executors, in the years 1866 and 1867, by arrangement with her son John, applied a large amount of the proceeds of the business to the permanent improvement of this lot, by the

Laible *v.* Ferry.

erection upon it of a valuable dwelling, chiefly for the accommodation of herself and her family. Under the will, the widow owned in it a life-estate only, the remainder in fee going to the testator's grandchildren, in case his widow died without remarriage; otherwise, belonging to his heirs. All of these grandchildren are minors; and some of the heirs, including the female appellants, are married women. The chancellor has decreed that this lot, with its improvements, shall be sold; and out of the purchase-money shall be reserved for the tenants in fee the full value of the unimproved land, and the surplus shall be applied to the payment of the trade debts. This decree is based, not upon any notion of fault or acquiescence in the remaindermen, but upon the ground that the proceeds of the business constituted a fund in the hands of the executors, as trustees, for the payment of creditors as *cestuis que trust;* and, therefore, a court of equity would pursue those funds and reclaim them from any one whose title did not depend upon an innocent purchase for value.

The correctness of this doctrine, as a general rule, cannot be disputed, but, in its application, it is liable to be restrained by other principles equally indisputable. It is perfectly well settled that where one knowingly makes permanent improvements upon the lands of another, without the consent or fault of the latter, he cannot, as a complainant in equity, obtain re-imbursement for such expenses, even to the value of the benefit conferred upon the land owner. *Green* v. *Biddle, 8 Wheat. 1; Putnam* v. *Ritchie, 6 Paige 390; Clark* v. *Smith, Sax. 121; Haggerty* v. *McCanna, 10 C. E. Gr. 48; 2 Kent *334.*

The facts now before us bring the complainants within the range of this principle. No acquiescence or laches can be imputed to the appellants, because of their coverture, nor to the grandchildren, because of their minority. The complainants knew that, in giving credit to this business, they were dealing with executors and trustees under this will, and had consulted counsel as to the powers of the

executors in the premises. They are clearly chargeable with knowledge of the character and limitations of the trust. *Wilson* v. *Hill, 2 Beas. 143; Shaw* v. *Spencer, 100 Mass. 382.*

Under the will, the executors had no right to divert the corpus of the fund embarked in the business for the improvement of the testator's outside lands, nor even to use the profits for such purpose; they were only authorized to invest such profits, if any, in bond and mortgage, or in the purchase of real estate. The evidence shows that, at the time this house was building, the complainants knew that the proceeds of the business, which should have been taken to pay debts, were being devoted to its construction, and in consequence their own claims were remaining unsatisfied. Thus they were apprised that their trustees, in violation of the trust, were using the moneys which ought to have gone to the payment of their debts, for the permanent improvement of another's land, and yet they made no objection or attempt at interference to prevent it. Such acquiescence is tantamount to consent, and puts the complainants in the same position as if they had been actors in the diversion. The moneys thus expended, it is therefore beyond their power to recall.

But even if the complainants were not chargeable with knowledge, or if there be other creditors who were ignorant of these facts, I do not see how they can fasten upon the estate of these innocent remaindermen any burden because of these improvements. They were not the owners of this fund which was embarked in the trade, but only the creditors of those who, from their control over it, might be regarded as its owners.

Now, certainly, the creditors of an individual cannot charge their debts, to any extent, upon the lands of a stranger, simply because their debtor has used his money to improve those lands, and so has rendered himself unable to pay his debts. And although Lord Eldon said (*Ex parte Garland, ubi supra*) that such creditors have something very

Laible *v.* Ferry.

like a lien upon the trade property, yet they have not an actual lien, but their right to resort to it arises, as we have seen, from the right of the executors to indemnify themselves out of it for the payment of the debts which they have incurred under the will. But the plain force of the principle before mentioned would clearly prohibit these executors, if compelled to pay the debts of this business, from charging the lands of these remaindermen for their indemnity. Here, then, the executors have so dealt with the trade fund as to destroy their right to indemnity out of it, and under such circumstances as would put their individual property beyond the reach of their creditors. Upon what ground can creditors seek to reclaim that fund for their benefit? The case does not seem to be one for the application of the principle by which a donee of trust funds is chargeable with the trust. These land owners do not stand in the position of donees. They did not consent to receive the fund, nor were they guilty of any laches in not preventing its incorporation with their estate; and it cannot be withdrawn from them without invading their right of property, which should not be assailed except for some act or omission of their own.

So far as it affects the interests of married women and infants, this part of the decree should be reversed.

Whether the complainants' mortgage is a valid charge upon the lands embarked in the trade, has not been considered in this court, as it is not the subject of appeal.

Decree unanimously reversed.