# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY, AND THE PREROGATIVE COURT,

MARCH TERM, 1894.

———

JOSEPH WEYMAN et al., appellants,

*v.*

HENRY C. THOMPSON et al., respondents.

The fact that administrators or executors have filed a joint final account, and that a certain balance has been adjudged by the orphans court to be due thereon, is not, *per se*, conclusive evidence as to their joint liability for the amount so settled.

———

On appeal from a decree of the chancellor, reported in *Weyman* v. *Thompson, 5 Dick. Ch. Rep. 8.*

*Mr. Joseph H. Gaskill,* for the appellants.

*Mr. Mark. R. Sooy* and *Messrs. Gilbert & Atkinson,* for the respondents.

The opinion of the court was delivered by

BEASLEY, C. J.

One Christian Weyman, of Burlington county, in this state, made his will in due form, whereby he appointed as his executors, Henry C. Thompson, Jacob Wilson (the appellant) and James L. Kemble.

The Henry C. Thompson thus appointed is described in these terms by the chancellor, in his opinion in this case. He says : He "was a lawyer of Philadelphia, who, when the will was made and until the year 1890, was reputed to be of considerable wealth and of undoubted integrity and ability. He was prominently connected with the management of two trust companies and was also executor or trustee of several estates. His residence was in Philadelphia, but he had a summer home on the Delaware river, at Beverly. For several years before Mr. Weyman's death he was Mr. Weyman's legal adviser and business agent, attending to his investments and the collection of the income therefrom, and rendering such legal assistance as from time to time was required of him. When Mr. Weyman died all his securities were in Mr. Thompson's possession."

It was this executor, thus correctly characterized, who practically administered the affairs of the estate. He had the assets in his hands, and he made, with a few trifling exceptions, all necessary disbursements, his two co-executors standing by and seeing the business thus transacted. Then followed a final settlement of the executorship, this account showing a balance in favor of the estate of $16,814.89. Subsequently, it was discovered that Thompson, the acting executor, had squandered the assets and was insolvent.

The chancellor found that the final account just mentioned was the joint account of all the three executors, and on that

account decrees that all the three are equally responsible for the balance adjudged by the orphans court to be due to the estate.

The rule upon which this decision was placed was extracted from an earlier case in chancery, and was thus stated, viz.: "That when executors exhibit for settlement a joint account, and when, by the decree of the orphans court, such account is finally settled and allowed, the executors are jointly charged with the balance thus ascertained to be in their hands. The decree is in the nature of a judgment."

Whether this rule, thus applied, be the legal rule upon this subject, is the only question that, for present purposes, will be considered and decided.

Although the principle thus referred to has, for a number of years past, been enforced in equity, this is the first occasion on which this court has been called upon to examine the legal propriety of that course of law.

The result of that inquiry is that the rule that has been thus frequently asserted, and which was adopted in this case as the basis of the decree appealed from, has no place in the law of this state.

The posture of this subject, as it appears from our reports, is a most singular one, and, as it is deemed, is without a parallel in judicial annals. Upon examination it will be found to be this: In the year 1828 the rule under criticism came before Chancellor Williamson (the elder) for consideration and judgment. The position of the case before the court on that occasion was in this wise: The bill was filed by Philemon Dunn and others, claiming certain moneys under the will of Gershom Dunn, deceased. Phineas Randolph and Barzillai F. Randolph were the executors of the will in question. The bill, among other things, charged that both of these executors, in a joint account before the orphans court, exhibiting their receipts and disbursements, thereby showed that there was due the estate several thousand dollars. It appeared that the executor Phineas had been the acting executor and that he had squandered the assets and was not solvent. To this bill Phineas did not appear, and a decree *pro confesso* was taken against him. The other execu-

tor, Barzillai, put in an answer, which consisted solely of the defence that he had not received any of the assets of the estate, but that the same had been dealt with exclusively by his co-executor, who was a man possessed of considerable property and of good repute. Under these circumstances the case came to argument, the only question being whether the fact that the answering executor had joined in the final account just mentioned, and that it had been passed by the orphans court, was conclusive upon him.

On the issue thus made, the following is the decree made by the chancellor: "It appearing to the court that the decrees of the orphans court of the county of Middlesex, the one made in the term of June, in the year of our Lord eighteen hundred and eight, and the other in the term of September, in the year of our Lord eighteen hundred and eleven, allowing and confirming the accounts of the said Barzillai F. Randolph and Phineas F. Randolph, executors of the last will and testament of Gershom Dunn, deceased, as aforesaid, are final decrees, made upon due notice and advertisement thereof, given and published by the said executors, as prescribed by law, and that the same were made on final settlement of the accounts of said executors; and that they ought to be and are final and conclusive between the parties, as well the complainants as the said defendants, as to the matters contained therein and established; and that the defendants, executors as aforesaid, ought to be jointly charged with the balance found in their hands by the last-mentioned decree of the said orphans court."

The decree then proceeds to order an account to be taken by a master, with this further direction that "the said accounts be taken subject to the said decree of the said orphans court and the accounts of the said executors therein and thereby confirmed, and without in anywise varying or impeaching the same."

It will be observed that the rule thus declared is the basis of the decree in the case now before this court.

The executor Barzillai F. Randolph, whose liability was thus established by reason of his having joined with his co-executor in a final account, which had been approved by the orphans

Weyman v. Thompson.

court, being dissatisfied with the decision against him, removed his case to the court of errors and appeals, which tribunal, in the term of May, 1831, "adjudged that the decree of the court of chancery be reversed &c. so far as respects the appellant, and that the bill of complaint in the cause be dismissed as to appellant, without costs."

It is reasonable to suppose, a priori, that this decision of the paramount court would have settled for the time, absolutely and incontestably, the rule of law under discussion; but such was not the fact, for thirty years afterwards the subject was considered by Chancellor Green, who apparently, without much consideration, declared that the legal rule which had been repudiated by this court did prevail in this state. The case in which this singular doctrine is announced is that of Laroe v. Douglass, 2 Beas. 310, and as the whole view of the chancellor is comprised in a few sentences, it seems best to transcribe them. The opinion says: "The law is well settled in this state that when executors exhibit for settlement a joint account, and where, by the decree of the orphans court, such account is finally settled and allowed, the executors are jointly charged with the balance thus ascertained to be in their hands. The decree is in the nature of a judgment. By the terms of the statute it is conclusive upon all parties, none of whom will be permitted to set up any matter in avoidance of its operation.

"This doctrine was distinctly announced by Chancellor Williamson in Dunn v. The Executors of Dunn, and, although that decree was reversed by the court of appeals, the same doctrine was subsequently held, and the principle upon which it rests distinctly enunciated by Chancellor Vroom in Fennimore v, Fennimore, 2 Gr. Ch. 296."

And this is the only ground assigned or in any way suggested for the refusal of the inferior court to conform to the judgment of the superior court. The entire course of reasoning is stated with conciseness and perspicuity. It is that Chancellor Williamson (the elder) decided that a joint settlement of their final account by several executors made them, per se, jointly liable for the failure thus exhibited; that such decision had been overruled

by the court of appeals; that Chancellor Vroom had afterwards distinctly held the repudiated doctrine, and that, consequently, that doctrine was the law of this state. It seems impossible to believe that this course of reasoning will be satisfactory to any lawyer; and even it, such as it is, is founded on the mistaken premises that the old doctrine, after its overthrow in this court, was subsequently held in the case of *Fennimore* v. *Fennimore*, for, by a reference to that decision, it will be made perfectly clear that Chancellor Vroom, on that occasion, did not reassert the old doctrine, but "enunciated" it simply for the purpose of showing that the decree of Chancellor Williamson, already stated, had been "reversed in the court of appeals in the last resort and upon that very point."

My conclusion is that it is entirely plain that the decision of this court, in the case referred to, established the rule that a joint final account and settlement by several executors, and its approval by the orphans court, does not, by reason of its own inherent force, impose a joint liability for the balance thus struck and adjudged. I cannot assent to the contrary result reached in *Laroe* v. *Douglass*, and which has been, on several occasions, followed by successive chancellors, for even my great respect for the eminent personage who rendered that judgment cannot lead me so far astray as to induce in my mind the feeling that a determination of this court can be reversed by the court of chancery. Consequently, as the proper legal rule was not applied to the case now presented, the decree before us must be reversed, and the bill, so far as concerns this appellant, should be dismissed, but without costs.

Before parting from this subject, it may not be amiss for me to express my opinion that the legal rule above stated and enforced is the best one that can be adopted as a regulation of the business to which it relates. Its effect is to exclude an arbitrary, technical rule having a tendency to ensnare the feet of unwary personal representatives, and to place each of such representatives on the footing of being responsible in the administration of estates for his own misfeasances and neglects. All experience has shown that the product of the opposite rule is hardship and

Weyman v. Thompson.

injustice.   In not a single instance, in which an executor has
been held liable for the malversation of a co-executor by reason
of his having joined in a final account with such wrongdoer, has
it been made to appear that the beneficiaries of the estate would
have been benefited if the executors had exhibited separate
accounts.    With respect to the suggestion that the "parties in
interest should not be driven to the necessity of discovering,"
after final settlement, "in whose hands the funds are or in what
proportion the executors are liable for their loss," the answer is
that such knowledge can always be had for the asking; for any
executor that should refuse to give the requisite information
would undoubtedly render himself liable for the misconduct of
his co-executor, who, in point of fact, was the actual custodian
of the assets.    There is no reason to believe, from experience in
this field of business, that the case has ever appeared in which
any beneficiary under a will has suffered either inconvenience or
loss, from the circumstance that the real depositary of the funds
of the estate was unknown to him.    Persons experienced in
affairs of this nature will agree with me that the instance scarcely
ever occurs in which the parties in interest are not aware, long
before the final settlement of the administration, which of the
executors has the moneys and securities of the estate in his
hands.

Nor is it perceived that there is any force whatever in the
notion that the decree of the orphans court, adjudged in those
settlements, that the personal representatives are jointly liable
for the balance struck.    It will be remembered that these judg-
ments are in the nature of proceedings *in rem* and they are only
conclusive on matters directly adjudicated, and those matters are
exclusively the receipts of the assets and the disbursements in
behalf of the estate.    The question which of the accountants has
in actual custody such assets, and who, therefore, are accountable
for them, is not before the court, and it is not, therefore, decided.

Let the decree appealed from be reversed and the case re-
mitted, to be proceeded with in accordance with the rule as
above expressed.

DIXON, J.

In May, 1882, Christian Weyman, of Burlington county, died, leaving a will in which he nominated Henry C. Thompson, Jacob Wilson and James L. Kemble as his executors. In June following, the will was proved before the surrogate of that county, and letters testamentary were issued to the persons so nominated.

In April, 1884, an account was presented to the orphans court, as follows:

"The account of Henry C. Thompson, Jacob Wilson and James L. Kemble, executors of the last will and testament of Christian Weyman, * * * as well of and for the estate which hath come into their hands to be administered, as for their payments and disbursements out of the same.

"The accountants charge themselves with the said estate, as per
    inventory...................................... ........................ $18,444 50
"And pray allowance for [here follow various items amount-
    ing to]............................................................. 980 48
        "Balance for distribution........................................ $17,464 02

                     "JACOB WILSON,  ⎫
                     "H. C. THOMPSON, ⎬ Executors.
                     "JAS. L. KEMBLE, ⎭

"Balance, as per account....................................... $17,464 02
[Here follow items for disbursements on settlement of the ac-
    count, including commissions on $18,444.50]...................... 649 13
        "Balance in hands of executors................................. $16,814 89"

The usual affidavit is annexed, made by H. C. Thompson.

This account was prepared by Thompson, and mailed or handed to each of the other executors for signature, and was signed by them as above indicated. It is not denied by either of these two executors that they knew the contents of the instrument, and they both admit that they signed it as the account to be filed in the court. They allege, however, that they had no knowledge as to its truth, but relied on Thompson's statements.

This account was audited and stated by the surrogate, the statutory notice of settlement was duly given, and in July, 1884, Joseph Weyman, one of the legatees, filed exceptions to the account. These exceptions were dismissed May 18th, 1885, and

at the September Term, 1885, the orphans court made and endorsed on the account the following order:

"The surrogate having audited and stated the within account and placed the same on the files of his office, and a notice of the settlement thereof having been published according to law, and the same being now reported for allowance and settlement, and no objection being made thereto, it is ordered and decreed that the said account be allowed in all things as reported."

Joseph Weyman now seeks, by bill in chancery, to hold all the executors responsible for his legacy under the will, and the executors Wilson and Kemble claim to be exonerated, on the ground that they never received any portion of the estate and took no part in its management, Thompson alone having acted as executor. Against this claim, the complainant sets up the account and decree above mentioned.

It is unquestionable that this was a joint account—on its face it purports to be—and it was signed by all the executors with a common purpose that it should be presented to the court as their account. It was also *finally* settled and allowed by the orphans court, which had obtained jurisdiction over the executors by the presentation of the account, and over all other persons concerned, by the statutory notice. *Black* v. *Whitall, 1 Stock. 572, 585; Pomeroy* v. *Mills, 10 Stew. Eq.̄ 578, 581.*

We must, therefore, consider the legal effect against co-executors of such an account and the decree thereon.

It may be stated as a general, perhaps as a universal, rule, that the judgment of a court of competent jurisdiction is conclusive upon all persons over whom it has acquired jurisdiction. This general rule is expressly declared by our statute respecting the orphans court, in these words:

"The sentence or decree of the orphans court on the final settlement and allowance of the accounts of executors, administrators, guardians or trustees, shall be conclusive upon all parties; * * * excepting also in cases where a party applying for a resettlement shall prove some fraud or mistake therein to the satisfaction of the said orphans court." *Rev. p. 775 § 108.*

This provision is as old as the court itself. *Pat. L. p. 59 § 17.*

The question then arises, what matters are thus conclusively established by the decree?

According to a long line of decisions in the court of chancery, such a decree on such an account conclusively fixes upon the individuals joining in the account a joint liability for the balance shown by the account. *Fennimore* v. *Fennimore, 2 Gr. Ch. 292, 296; Laroe* v. *Douglass, 2 Beas. 308; Schenck* v. *Schenck, 1 C. E. Gr. 174; Suydam* v. *Bastedo, 13 Stew. Eq. 433; Tehan* v. *Maloy, 18 Stew. Eq. 68.* This ruling, however, does not seem to be consistent with the judgment rendered by the court of last resort in *Dunn* v. *Dunn's Executors (May Term, 1831),* according to the statement of Chancellor Vroom. See *2 Gr. Ch. 296.* In that case Chancellor Williamson had decided that two executors, having filed a joint account which had been settled and allowed by decree of the orphans court, " ought to be jointly charged with the balance found in their hands by that decree," and he had decreed accordingly ; but his decree was reversed on appeal of one of the executors, by a vote of eight to six, and Chancellor Vroom, who was president of the court of appeals at the time, says the reversal was on the very point of joint liability, and was calculated to 'unsettle the course of decision on this important question.

It is our duty to follow the deliberate judgment of the court whose successors we are, unless it appears to be " flatly absurd or unjust," as Blackstone puts it (*1 Com. 70*), or " except for very cogent reasons and upon a clear manifestation of error," in the words of Kent. *1 Com. 476.* If I were driven to consider the final decision in *Dunn* v. *Dunn's Executors,* as holding that the decree of the orphans court was not conclusive upon the executors with regard to all matters open to litigation respecting their account, then I would be prepared to say it was " flatly absurd " and presented " a clear manifestation of error," for, as before stated, such conclusiveness is almost essential to the judgments of judicial tribunals, and is expressly awarded by statute to the decrees of the orphans court upon such accountings.   But

I do not so interpret the decision in *Dunn* v. *Dunn's Executors.*
I regard it as holding merely that the decree of the orphans court
does not purport to adjudge in whose hands the estate accounted
for has been or is.   The orphans court decides that the executors·
have received the assets with which the account is charged, and.
have properly disbursed the items with which the account is
credited, and that there remains in their hands the balance shown,
but whether all the executors, or only some or one of them,
received these assets, made these disbursements, or holds this
balance, are questions not presented for consideration, and there-
fore not adjudicated.   Yet these are the very questions on which
the joint or several liability of the executors depends.

This view of the effect of the decree of the orphans court is, I
think, correct.

It is true that, in stating a joint account, executors and others
usually say, "they charge themselves with," and "they pray
allowance for," and the balance is "in their hands," but in fair-
ness this language should not be taken literally as denoting
individual conduct.   Manifestly it is not so intended, for it
rarely happens that co-executors have jointly received or paid or
held their testator's property, and the ordinary phraseology of
their accounts should not be deemed to import so unusual an
occurrence.   In a reasonable sense, a charge against one executor
is a charge·against all officially, a payment by one is a payment
by all officially, and a balance in the possession of one is in the
hands of all officially.   This is the true meaning of the joint
account and the decree thereupon.   But when it is sought to use
this decree against the individuals, then it is open to them to
show their individual acts not inconsistent with the account and
decree.   They may not show that no executor received the
assets specified, but they may show which one did; they may
not show that at the time of the accounting no executor had the
balance stated, but they may show which one had it.

Nor can it be reasonably claimed that, by joining in an
account, the executors· have expressed an intention or willingness
to become jointly chargeable with each other's acts.   It ·is not
the appropriate function of an accounting to assume obligations

18

which the facts as reported would not create, and so serious a responsibility as that suggested should not be inferred from a transaction which at most is equivocal.

The rule thus indicated is not only in harmony with general principles, with the statute and with the decision of this court in the case cited, but is in itself eminently just. While it prevents a mere form from fastening upon co-executors and trustees a liability which the substance of things would not impose, it exacts of them this plain duty, that they shall not present to persons interested in the estates confided to them, and submit to the court for solemn adjudication, an account which they do not then know to be true. With the right which the law gives, of being relieved from the effect of fraud or mistake, in the orphans court and in a court of equity, no fear of injustice need be entertained.

In the present case the chancellor's decree is that the three executors are to be jointly charged with the balance found upon their accounting, $16,814.89, with interest from the date of said accounting.

It is substantially conceded that Thompson alone received and managed the assets of the estate. He absconded in the year 1890, six years after the accounting, and then whatever of the estate had not been paid in due course of administration or to legatees, had been wasted or embezzled by him. Whether he had wasted or embezzled anything before presenting the account is uncertain. The only suggestive circumstance is that mortgages, amounting to $12,270, which were inventoried by the executors simultaneously with the account, had, in fact, been previously turned into cash by Thompson. As, however, these mortgages did exist at the death of the testator and the inventory should probably be read as of that time, this circumstance may be insignificant.

Evidently the cause was tried below on the theory, sanctioned by so long a practice, that a joint account created a joint liability. This being now adjudged erroneous, I think the decree should be reversed, as to these appellants, and that an account should be taken, charging them with only so much of the bal-

ance before stated as shall be found not to have been in the hands of Thompson when the account was filed.

Justices DEPUE, VAN SYCKEL and MAGIE concur in this opinion.

*For reversal*—THE CHIEF-JUSTICE, ABBETT, DEPUE, DIXON, GARRISON, LIPPINCOTT, MAGIE, REED, VAN SYCKEL, BROWN —10.

*For affirmance*—None.