Julius M. Guter, late of South Orange, died December 27th, 1928, leaving a will in which his widow, Stella D. Guter, and the Fidelity Union Trust Company were named executors. The will was promptly probated and letters testamentary were issued by the surrogate of Essex County to the executors. Mr. Guter gave his residuary estate, both real and personal, to the Fidelity Union Trust Company as trustee, for his widow for life, the remainder to his two sons, one of whom died shortly after his father. The executors in November, 1929, filed their inventory and appraisement of *Page 406 
the estate totaling $220,599. The next spring, they filed an account which was entitled as a final account and which showed a balance in their hands of $143,734, invested as therein shown. By decree dated May 7th, 1930, the Orphans Court approved the account.
In September, 1938, testator's widow, who is now Mrs. Brown, petitioned the Orphans Court to cite the Trust Company to account as trustee under the will, but before the matter had proceeded far, she decided that a change of forum would be wise. So, on March 6th, 1939, she filed her bill in this cause, praying that Chancery take jurisdiction of the estate, that the will be construed in certain particulars, and that the Trust Company, both as executor and trustee, be directed to account in this court. The surviving infant son of testator, who was joined as a defendant, answered and counter-claimed, by his guardian adlitem, seeking an account from complainant as executrix, as well as from the Trust Company as executor and trustee. The Trust Company answered, annexing to its answer a document entitled supplemental final account of Mrs. Brown and the Trust Company, as executors for the period March 1st, 1930, to March 16th, 1940, Mrs. Brown "having refused to swear to or subscribe said account." By a second supplement, the account has been brought up to January 1st, 1944. Exceptions have been filed by complainant and the infant defendant to both accounts.
The defendant Trust Company has taken four appeals to the Court of Errors and Appeals from interlocutory orders in this suit and the complainant one appeal. 128 N.J. Eq. 197; 129 N.J. Eq. 100;129 N.J. Eq. 379, and 133 N.J. Eq. 278. Early last winter, the cause came on for partial final hearing before this court on the matter of the construction of the will, 134 N.J. Eq. 217, and complainant's appeal from the decree then made is pending. The cause is now up on final hearing on all other questions raised by the pleadings and the exceptions to the accounts and also on a petition on behalf of the infant, to open the decree of the Orphans Court made in 1930, approving the so-called final account of the executors in order that the infant may attack certain items in that account. *Page 407 
The petition to open the settlement in the Orphans Court is based on alleged fraud and mistake and on the circumstance that the infant petitioner was not represented by a guardian adlitem or otherwise on the accounting. To support the last ground, petitioner relies on a dictum of Vice-Chancellor Backes in Clayton v. Asbury Park and Ocean Grove Bank, 115 N.J. Eq. 480,
that if no guardian represents the infant in the Orphans Court, the decree on the accounting is voidable at the instance of the infant on coming of age.
The accounting in the Orphans Court is a proceeding in rem, analogous to proceedings in admiralty. The posting and publication of notice pursuant to the statute, R.S. 3:10-11, is constructive notice to all interested persons. The decree is conclusive against all the world, including creditors, legatees and other beneficiaries. Exton v. Zule, 14 N.J. Eq. 501;Search's Adm'r v. Search's Adm'rs, 27 N.J. Eq. 137; Weyman v.Thompson, 52 N.J. Eq. 263; In re Slater's Estate, 88 N.J. Eq. 296; Beam v. Paterson Safe Deposit and Trust Co., 96 N.J. Eq. 141; 99 N.J. Eq. 427; In re Bradford, 128 N.J. Eq. 372;Restatement — Judgments, § 73. The decree is conclusive on persons who have no actual knowledge of the proceeding and whether they are competent or incompetent. They are safeguarded, not by a right to attack the decree, but by the provisions which the legislature has devised for ensuring a right decree in the first instance, such as the audit by the surrogate, R.S.3:10-13, and the examination into the matter which the court is required to make, R.S. 3:10-15.
It is the general rule that a guardian ad litem need not be appointed to represent an infant in a probate court unless required by statute, 31 C.J. 1120. In New Jersey, no statute requires it and until very recently no appointment was customary. When we recall how frequently infants are interested in decedent's estates and that the practice of settling the accounts of executors and administrators without a guardian prevailed for over a century, we cannot believe that such settlements have been voidable at the option of the infant. *Page 408 
No case avoiding the decree on the ground of infancy can be found, while the statute itself as well as the cases above cited, among others, lay it down that the decree can be disturbed only for fraud or mistake. I am satisfied that the infancy of petitioner is not a ground for relief. In re Schlemm, 130 N.J. Eq. 295,312; In re March, 17 N.J. Mis. R. 157.
There is no slightest proof of fraud. The alleged mistakes on which petitioner relies were the approval by the court of sundry items in the account which petitioner urges should not have been allowed. It is not shown that the judge misapprehended the nature of the items, or did not intend to approve them. If his action was in any way incorrect, it was mere error. Error is not mistake for which a decree will be opened.
On a bill for an accounting, if the defendant denies the duty to account, established procedure requires first a hearing to determine whether the defendant should account and only after such determination is the account filed. But when defendant concedes that complainant is entitled to an accounting, the preliminary hearing becomes unnecessary and it is good practice for defendant to file the account with his answer. Indeed, it was considered in the early days that if the defendant answered instead of putting in a plea or demurrer, he must include the account in his answer. Pace v. Bartles, 45 N.J. Eq. 371.
Complainant excepts to the whole account annexed to the answer because it is entitled an executor's and not a trustee's account. The exception will be disallowed since the proofs show that the account includes all transactions of the Trust Company and Mrs. Brown, or either of them, whether as executor or trustee. And an inspection of the account itself discloses some receipts and disbursements which belong in an executor's account and others which pertain to the residuary trust.
In theory, each act of the fiduciary is the act of the executor, or else the act of the trustee; it cannot be both, although it may be difficult to decide in some particular matter in which capacity the fiduciary acts. Pitney v. Emerson,42 N.J. Eq. 361; In re Steelman's Estate, 87 N.J. Eq. 270. The duties of an executor are to take possession of the testator's *Page 409 
personal assets and usually to convert them into money; to pay the testator's debts, funeral expenses, estate and inheritance taxes, and administration expenses; and to pay legacies.Restatement — Trusts, § 6. For example: When the defendant company, on March 1st, 1929, two months after testator's death, paid the life beneficiary of the residuary trust $1,000 of income, it was the act of the trustee, although the payment was shown in the Orphans Court in the account called the final account of the executors. And three years later, March 26th, 1932, the payment of $3,575 on account of testator's debt on a mortgage bond, was the act of the executor and not the trustee. The functions of executor and trustee, while separate, are so often intertwined, that counsel frequently entitle an account in both aspects. Obviously, the accounts before me are of that character and they will be established by the decree as accounts of the Trust Company, both as trustee and as executor.
Mrs. Brown also complains because the Trust Company did not "set up" the trust long ago by giving a refunding bond to the executors and having the bank account and securities transferred to its own name as trustee. I agree, with one limitation, that this should have been done about the middle of 1932. The securities, which ought to have been transferred, do not include securities which the executors were under a duty to convert and which the trustee could not properly accept. The transfer and the execution of the bond will be ordered. The beneficiaries of the trust, however, have suffered no injury by the delay, for the Trust Company has actually been administering the trust and is accountable for all its acts and omissions as trustee, as fully as if it had gone through the forms of taking title. The contention of complainant "that the Fidelity Union Trust Company must, at this late date, establish the residuary trust in cash for the amount as shown by the executor's final account, which was passed in 1930," is patently unsound and is noticed only because it is pressed by counsel at such length. Of course, no authorities are adduced, which support the claim. The company is liable to the beneficiaries for injury flowing from any wrongful acts such as unauthorized investments, or disbursements, *Page 410 
but it cannot be pretended that the beneficiaries are damaged because stock certificates continued in the name of Mrs. Brown and the company as executors, instead of being transferred to the company as trustee. Hence, there is no basis for a surcharge.
Testator, in his lifetime, owned shares of stock in Financial and Industrial Corporation. In 1929, after testator's death, the company merged into Goldman-Sachs Trading Corporation. This it did by transferring all its assets to the Trading Corporation, in exchange for stock of that corporation, and forthwith dissolving and distributing the Goldman-Sachs stock among its stockholders. The executors accepted the stock and at the date of their account in the Orphans Court still held 207 shares as appears from the schedule of assets. The schedule of changes in investments, also annexed to the account, fails oddly enough to show the receipt of the Goldman-Sachs stock. The infant challenges the right of the executors, or the trustee to retain that stock. The first defense is that the attack is precluded by the decree of the Orphans Court. It is my opinion the defense fails in large part.
To what extent, and on what issues, is the decree of the Orphans Court conclusive? If exceptions had been taken to the account and litigated, the issues then determined could not now be fought over anew between the same parties. But since there was no real litigation in the Orphans Court, its decree only establishes conclusively that on March 1st, 1930, the date of the account, the executors were accountable for the balance stated therein, and forever discharges them beyond that amount. R.S.3:10-18; Conover's Ex'rs v. Conover, 1 N.J. Eq. 403; Frey v.Demarest, 16 N.J. Eq. 236; Shearman v. Cameron, 78 N.J. Eq. 532; In re Slater's Estate, 88 N.J. Eq. 296. The decree adjudged in the usual form, "that the said account be in all things allowed as reported, and that there is a balance remaining in the hands of said accountants, amounting to the sum of $143,733.80 to be disposed of according to law." From this language it is argued that the executors are chargeable with that sum in cash, or at the least with assets then actually worth that sum. *Page 411 
But the decree must be interpreted in the light of the practice and rules of the Orphans Court.
The Ordinary in 1871 had been empowered to make rules to regulate the pleadings in practice in the Orphans Courts. R.S.2:30-1. When the Guter estate accounting was in the Orphans Court, the rules promulgated by the ordinary and which had been in effect many years, required a summary to be attached to the account which "in the case of a first accounting, shall recite the amount of the inventory, the amount shown by the account to have been collected in addition thereto, the amount of expenditures and shall state the balance in the hands of the accountant." Rule 19 (1915): Rule 25 (1941). The present rule directing the accountant to show current value was not in effect in 1930. The long-established practice of the Orphans Court conformed to these rules, and in harmony with them was the Guter executors' account. It shows:
 Inventory ..................... $220,599
 Additions ..................... 9,741
 ________
 $230,340
 Disbursements ................. 86,606
 ________
 Balance ....................... $143,734

Furthermore the rules in 1930 contemplated, as they still do, that the estate, even on the executor's final account, might not be all in money but would include securities and other assets. So the executor was required to annex to the account a "list of the securities, investments and assets of which the balance of the estate in his hands consists." Rule 27 (1941). Annexed to the account is the schedule of assets, $2,445 in cash, and $141,289, mostly in stocks which had been owned by testator and are shown at inventory value; or, in a few instances, inventory value plus or minus sums expended or received by the executors on account of the particular asset. Investments made by the executors are stated at cost. This method of accounting was proper. Let us see how it worked in a typical instance:
The testator left 175 shares of United States Steel common *Page 412 
stock then worth $27,213, which the executors and trustee were empowered to sell or retain at their discretion. They sold 75 shares for $13,144 and kept the other hundred shares; they sold for $375 rights to subscribe to additional shares. This appears in the account as follows:
175 shares (part of Inventory $220,599) ................ $27,213
75 shares sold (Investment change) ............. $13,144
Rights sold (Investment change) ................ 375 13,519
 ________ _______
100 shares retained (Schedule of Assets) ............... $13,694

This item, $13,694, is part of the sum of $143,734 contained in the decree. Actually, the Steel shares, when the executors accounted, were worth more than the figure stated, or about $19,000. The exceptants, in effect, assert that the executors should have shown in their account and charged themselves with the amount of the increase as if it had been money received. In other and more frequent items, the accountant, according to this theory, should have prayed allowance for declines in value, as if they had been disbursements. Occasionally an accountant does put paper profits or losses into his account, in order to reach a balance closer to actual values, but the procedure is exceptional and not required by rules.
The decree of the Orphans Court means no more than that the executors had on hand and were chargeable with the assets shown in the schedule which footed up to $143,734, made up of the inventory value of some assets and the purchase price of others. It does not charge them with that amount in cash, or establish that the assets were then worth that sum. Macy v. MercantileTrust Co., 68 N.J. Eq. 235; Adams v. Camden Safe Deposit andTrust Co., 121 N.J. Law 389.
The decree discharges the accountants from liability as of March 1st, 1930, for Financial and Industrial stock, since none of that stock is listed in the schedule. Such surcharge would increase the liability of the accountants above the amount ascertained by the decree. And the decree does fix the accountability of the executors for whatever value Goldman-Sachs had on March 1st, 1930, and does not establish that the executors could legally or properly continue to hold *Page 413 
the shares, since no issue on the subject was made before the Orphans Court. In re Ward, 121 N.J. Eq. 555 and 606. In order to show that they ought not retain the shares, the infant can inquire how the shares first came into the executors' hands.
Mr. Guter's will expressly authorized his executors and trustee to hold as part of his estate and of the residuary trust any investments made by him in his lifetime notwithstanding they might not be such as are legal for trust investments under our law. A similar statutory provision is R.S. 3:16-12.
"If a trustee holds shares of a corporation which he can properly retain, and the corporation is merged or reorganized into a new corporation, the trustee can properly receive and retain new shares issued in exchange for the old, but only if the new shares are substantially equivalent to the old. The difficulty arises in determining whether the new shares are substantially equivalent to the old. As was said by Cardozo, C.J., in one of the cases cited below (Werts v. Guaranty TrustCo. (N.Y.), 159 N.E. Rep. 896; 57 A.L.R. 1114): `Here, as elsewhere, distinctions of degree may mark the boundary between right and wrong.' The determining factor is the substance of the transaction rather than its form." In re Riker, 124 N.J. Eq. 228; 125 N.J. Eq. 349. See, also, Hewitt v. Hewitt, 113 N.J. Eq. 299,308. The rule applies equally to executors.
Were the Goldman-Sachs shares substantially the equivalent of the Financial and Industrial stock which testator had owned? Both corporations were so-called investment trusts, holding much the same class of stocks. They were practically equal to each other in value of assets before the consolidation and upon consummation thereof, the former Financial and Industrial stockholders held one-half of the shares of Goldman-Sachs while that company's old stockholders held the other half. The staffs of both organizations were retained. There was in existence at the time a management agreement between Goldman-Sachs Trading Corporation and the banking house of Goldman-Sachs Co., whereby the latter decided what stocks and when, should be bought for or be taken out of the *Page 414 
portfolio of the Trading Corporation. This agreement, although terminable at the will of either party, continued in operation after Goldman-Sachs absorbed Financial and Industrial.
It is my judgment that the executors' authority to keep investments made by the testator, did not empower them to retain Goldman-Sachs stock. The shares of that company were not substantially the equivalent of the shares which testator had owned. The two companies were much alike even before the merger, and afterward the consolidated company bore a strong resemblance to Financial and Industrial. But that is as far as we can go and it is not far enough. It was, therefore, the duty of the executors, having in their hands this unauthorized investment, when they settled their account in the Orphans Court, to dispose of the shares within a reasonable time thereafter. Having failed to do so, they must be charged with what the estate would have received had they sold the shares during that period. I will hear counsel as to the figures and take more proof, if necessary.
On the same principle, the executors are responsible for the value of 2 1/7th shares of Drug, Inc., which came into their hands July 24th, 1930.
Complainant naturally tries to put the entire burden on the Trust Company but without success. She took an active part in the administration of the estate and participated in all decisions. Since the trustee could not properly accept the shares in question as a part of the residuary trust, it was incumbent on complainant equally with her co-executor, to convert the shares into money. The settlement of their account did not absolve them from this duty. Her good faith and her ignorance of the law were no greater than the good faith and ignorance (in this instance) of the Trust Company, and neither of them is thereby relieved of liability. "Due care and good faith cannot justify a trustee who, under a mistake of law, intentionally does that which is prohibited or is beyond his powers or who intentionally omits what is required of him. He cannot plead the advice of counsel."In re United Conclave Building and Loan Association, 135 N.J. Eq. 63. *Page 415 
The Trust Company appealed from four interlocutory orders in this cause and each order was affirmed or the appeal dismissed with costs. From a fifth order the complainant appealed and though she was defeated and the order affirmed with minor clarifying modifications, she was allowed her costs of appeal and the same were paid by the company. The company prays allowance out of the estate for these costs as well as its own expenses for printing, c., on the appeals.
It is well established that an executor or trustee is personally liable on his own contracts and for his own acts even though the contracts were made and the acts performed in the course of administration of the estate and operated to its advantage. Sibbet v. Lloyd, 11 N.J. Law 163; Doolittle v.Willet, 57 N.J. Law 398; Lewis v. Morgan, 132 N.J. Eq. 343.
The fiduciary, however, in a proper case, is reimbursed out of the estate. Laible v. Ferry, 32 N.J. Eq. 791; 33 C.J. 1206.
The judgments of the Court of Errors and Appeals determined no more in respect to costs than that the respondents on the first four appeals and the appellant on the fifth should have their costs and that they be paid by the Trust Company. The appellate court did not determine and had not the question before it, whether the company should be indemnified out of the estate.
On the company's appeals, the main questions were whether Chancery properly retained the suit or should have remitted the controversy to the Orphans Court, and whether Chancery erred in striking from the Trust Company's answer certain paragraphs on which the company relied in part for avoiding personal liability for questioned investments. The appeals did not work to the advantage of the cestuis que trust and were not prosecuted for their benefit. The company must stand the expense. Complainant's appeal was from an order which was described by Mr. Justice Bodine (133 N.J. Eq. 278) as one which operated to "improve the trust estate by substituting legals for securities in doubt." There is no reason why the company should bear the expense of resisting the attack on the order. It may pass the burden on to the estate.
The last subject for discussion arises between complainant *Page 416 
life tenant and the infant remainderman and is whether certain disbursements should be charged to income or principal. The executors' account in the Orphans Court made no distinction between corpus and income and likewise the decree only ascertained the general balance on hand and not so much corpus
and so much income. As a prelude to the accounting in Chancery, the Trust Company reviewed the receipts and disbursements during the first accounting period and allocated to income receipts of $5,092 and contra payments to the life tenant $6,000 and sundry disbursements of $1,339, making an overpayment of $2.247 to the life tenant out of corpus at the expense of the infant. In the present account, income is charged and corpus credited that sum. At the hearing before me, the trustee presented proof that further analysis of the old disbursements revealed additional items of $131 net that ought to be charged income, making the total $1,470, and the overpayment to the life tenant $2,378. Assuming for the moment that this sum is correct, the executors were liable to the infant for its restoration to corpus.
However, the trustee has recouped it out of current income falling due the complainant so that corpus is now whole. In this the trustee acted properly. Ballantine v. Young, 74 N.J. Eq. 572; 76 N.J. Eq. 613; 34 C.J.S. 411; Restatement — Trusts, §254.
Among the disbursements which I have mentioned were payments of $1,083 for interest, taxes and insurance premiums accrued since testator's death, on lands of two small companies in which the testator was interested as a large minority stockholder. Furthermore, he was liable on bonds secured by mortgages on their lands. The investments never brought in any income and eventually became a total loss and the executors had to pay part of the principal debt. The life tenant argues that these disbursements should be charged to corpus. Where there is a gift, directly or in trust, of a life interest in the residuary estate, the interest on testator's debts accruing after his death should be charged against income. Berger v. Burnett, 95 N.J. Eq. 643;Trust Company of New Jersey v. Glunz, 121 N.J. Eq. 593. This rule justifies the trustee's allocation of interest. Ordinary taxes on non-income-bearing property, part of the residue, are also paid *Page 417 
out of income. Outcalt v. Appleby, 36 N.J. Eq. 73; Combes v.Cadmus, 36 N.J. Eq. 382; 37 N.J. Eq. 264. But the taxes in question were levied on the lands of the corporations and not on the stock shares which were part of the estate. The executors properly paid a proportion of the taxes as well as insurance premiums to keep the status quo until a sale of the lands or the shares could be effected which would save some part of testator's investment. While their efforts were not successful to that degree, they did result in relieving the estate of part of the debt on the bonds. These payments resulted in increasing the residuary estate and should be charged against corpus.
Like problems of allocation arise from disbursements during the current accounting period and will be decided in the same way.
I have considered the exceptions with respect to Gilken Realty Company, Gutahn Realty Company, Universal Finance Company, and the lots at Averne, Long Island, and find them without merit. This disposes of the last of the exceptions and other matters which have been argued. Exceptions not argued will be overruled. *Page 418